IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 5 2003

Michael N. Milby, Clerk

| | | |
|---|---|---|
| In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION | § § § | MDL 1446 |

| | | |
|---|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, Derivatively On Behalf of ENRON CORPORATION | § § § § § § § | |
| Plaintiff, | | |
| VS. | § § § | CIVIL ACTION NO. H 01-3645 LEAD CASE CONSOLIDATED WITH |
| KENNETH L. LAY, ROBERT A. BELFER, NORMAN P. BLAKE, JR., RONNIE C. CHAN, JOHN H. DUNCAN, WENDY L. GRAMM, ROBERT K. JAEDICKE, CHARLES A. LEMAISTRE, JOHN MENDELSOHN, PAULA V. FERRAZ PEREIRE, FRANK SAVAGE, JOHN WAKEHAM, HERBERT S. WINOKUR, JR., ANDREW S. FASTOW, AND ENRON CORPORATION, an Oregon Corporation, | § § § § § § § § § § § § § § | |
| Defendants | § | |

| | | |
|---|---|---|
| RICK BARSKEY, | § § | |
| Plaintiff | § § | |
| VS. | § § | CIVIL ACTION NO. H-02-1922 |
| ARTHUR ANDERSEN, LLP, ET AL., | § § § | |
| Defendants. | § | |

#64

## PLAINTIFF RICK BARSKY'S AMENDED COMPLAINT

TO THE HONORABLE COURT:

Plaintiff RICK BARSKY files this Amended Complaint, complaining of Defendants ARTHUR ANDERSEN, L.L.P., D. STEPHEN GODDARD, JR., DAVID DUNCAN, KENNETH L. LAY, JEFFREY K. SKILLING, ANDREW S. FASTOW, RICHARD A. CAUSEY, JAMES V. DERRICK, JR., MICHAEL J. KOPPER, MARK A FREVERT, STANLEY C. HORTON, KENNETH D. RICE, RICHARD B. BUY, LOU L. PAI, ROBERT A. BELFER, NORMAN P. BLAKE, JR. RONNIE C. CHAN, JOHN H. DUNCAN, WENDY L. GRAMM, ROBERT K. JAEDICKE, CHARLES A. LEMAISTRE, JOE H. FOY, JOSEPH M. HIRKO, KEN L. HARRISON, MARK E KOENIG, STEVEN J. KEAN, REBECCA P. MARK-JUSBASCHE, MICHAEL S. MCCONNELL, JEFFREY MCMAHON, CINDY K. OLSON, BRUCE WILLISON, FRANK SAVAGE, HERBERT S. WINOKUR, JR, JEROME J. MEYER,  CHARLES E. WALKER, PAULO V. FERRAZ PEREIRA, JOHN WAKEMAN, JOSEPH W. SUTTON, J.P. MORGAN CHASE & CO, and CITIGROUP INC., and for cause of action would show this Honorable Court as follows:

### I.

### SUMMARY OF ACTION

1.1     This case involves egregious fraud, self-dealing, insider trading, and betrayal of trust on the part of the Defendants. For years, Defendants have conspired to misrepresent the financial stability of Enron Corporation ("Enron") and affiliated entities for the purpose of increasing Enron's stock price.  Defendants made material misrepresentations and violated securities laws by engaging in massive insider trading to the detriment of Plaintiff and the public in general.

1.2     Beginning in late 2001, it was revealed that the Company would incur losses of $1 billion for certain of its divisions and that Enron would be restating its results for 1997, 1998, 1999 and 2000, and the first two quarters of 2001. The purpose of the restated earnings would be to correct errors which had inflated Enron's net income by $591 million in those years. Upon these disclosures, Enron's stock dropped to as low as $8.20 before closing at $8.41 on November 8, 2001, some 91% below the high of $90.75. Then, on November 28, 2001, it was revealed that the attempted acquisition of Enron by Dynegy would be scuttled. Thereafter, Enron's debt was cut to junk bond status and its stock dropped to just $ 0.26 per share. On December 11, 2001, Enron filed for Chapter 11 bankruptcy protection.

## II.

### PARTIES

2.1     Plaintiff RICK BARSKY is an individual who resides in Houston, Harris County, Texas.

2.2     Defendant Arthur Andersen, L.L.P. is an Illinois limited liability partnership and a firm of certified public accountants which does substantial business in the State of Texas, and is licenced to practice accountancy in this State. This Defendant has been served and has appeared herein through counsel.

2.3     Defendant STEPHEN GODDARD, JR. ("Goddard") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Mr. Goddard is the office managing partner of the Houston, Texas office of Arthur Andersen.

2.4     Defendant DAVID DUNCAN ("D. Duncan") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Mr. Duncan was the Arthur Andersen partner in charge of the Enron account.

2.5     Defendant KENNETH L. LAY ("Lay") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Mr. Lay was a director of Enron, Chairman of the Board of Directors of Enron, and Enron Chief Executive Officer from 1986 until February 2001. During the period from 1997 to present, Lay sold 1,810,793 shares of Enron stock for $101 million.

2.6     Defendant JEFFREY K. SKILLING ("Skilling") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Mr. Skilling served as a director of Enron and he served as the Company's President and Chief Operating Officer until February 2001, when he became Chief Executive Officer. Mr. Skilling resigned as Enron President and Chief Executive Officer in August 2001. During the period from 1997 to present, Skilling sold in excess of one million shares of Enron stock for more than $66 million.

2.7     Defendant ANDREW S. FASTOW ("Fastow") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Mr. Fastow served as Enron's Chief Financial Officer from 1998 until he was fired in October 2001. During the period from 1997 to present, Fastow sold in excess of 500,000 shares of Enron stock for more than $30 million.

2.8     Defendant RICHARD A. CAUSEY ("Causey") is an individual residing in Spring, Montgomery County, Texas, who has been served and has appeared herein through counsel. Causey served as Executive Vice President and Chief Accounting Officer of the Company. During the

period from 1997 to present, Causey sold in excess of 190,000 shares of Enron stock for more than $13 million.

2.9     Defendant JAMES V. DERRICK, JR. ("Derrick") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Mr. Derrick served as Enron's General Counsel and Senior Vice President. During the period from 1997 to present, Derrick sold 230,660 shares of Enron stock for more than $12.6 million.

2.10     Defendant MICHAEL J. KOPPER ("Kopper") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Mr. Kopper served as a managing director of Enron Global Equity Markets Group.

2.11     Defendant MARK A FREVERT ("Frevert") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Frevert has been Chairman and Chief Executive Officer of Enron Wholesale Services since June 2000, and Chairman and Chief Executive Officer of Enron Europe from March 1997 to June 2000. From 1997 to present, Frevert sold 830,620 shares of Enron stock for more than $50.2 million.

2.12     Defendant STANLEY C. HORTON ("Horton") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Horton was the Chairman and Chief Executive Officer of Enron Transportation Services. From 1999 to present, Horton sold 734,444 shares of Enron for more than $45.4 million.

2.13     Defendant KENNETH D. RICE ("Rice") is an individual residing in Houston, Texas and has been served and has appeared herein through counsel. Rice has been the Chairman and Chief Executive Officer of Enron Broadband Services, Inc. since June 2000. Prior to that, Rice was Chairman and Chief Executive Officer of Enron Capital & Trade ("ECT") – North America from

March 1997 until June 1999. From 1997 to present, Rice sold 1,138,320 shares of Enron stock for proceeds of $72.7 million.

2.14    Defendant RICHARD B. BUY ("Buy") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Buy was Executive Vice President and Chief Risk Officer of Enron since July 1999, and has been Senior Vice President and Chief Risk Officer. During the period from 1997 to present, Buy sold in excess of 50,000 shares of Enron stock for more than $4 million.

2.15    Defendant LOU L. PAI ("Pai") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Pai was Chairman and Chief Executive Officer of Enron Accelerator and prior to that was a director of Enron Energy Services and was involved in setting up some of the bad deals. From 1997 to present, Pai sold 5,031,105 shares of Enron stock for proceeds of $353.7 million.

2.16    Defendant ROBERT A. BELFER ("Belfer") is an individual who has been served and has appeared herein through counsel. Belfer has served as a Director of Enron since 1983, serving on its Executive Committee and Finance Committee. From 1999 to present Belfer sold over 1 million shares of Enron for in excess of $51 million.

2.17    Defendant NORMAN P. BLAKE, JR. ("Blake") is an individual residing in Colorado Springs, Colorado. Blake has been served and has appeared herein through counsel. Blake has served as a Director of Enron since 1993, serving on the Finance and Compensation Committees. During 2000, Blake sold more than 20,000 shares for in excess of $1.7 million.

2.18    Defendant RONNIE C. CHAN ("Chan") is an individual residing in Hong Kong, and has been a Director and member of the Audit Committee for Enron from 1997 to present and has

been served and has appeared herein through counsel. During 1999, Chan sold 8,000 shares of Enron stock for $337,200.

2.19    Defendant JOHN H. DUNCAN ("J. Duncan") is an individual residing in Houston, Harris County, Texas who has been served and has appeared herein through counsel. Duncan has served as a Director of Enron since 1985, serving on the Executive Committee, including as Chairman, and the Compensation Committee. Duncan executed the 1997, 1998, 1999 and 2000 financial statements of Enron. During 2001, Duncan sold 35,000 shares for more than $2 million.

2.20    Defendant WENDY L. GRAMM ("Gramm") is an individual who has been served and has appeared herein through counsel. Gramm served as a member of the Audit Committee for Enron from 1997 to present. During 1998, Gramm sold more than 10,000 shares for in excess of $275,000.

2.21    Defendant ROBERT K. JAEDICKE ("Jaededicke") is an individual residing in Palo Alto, California and has been a Director and member of the Audit Committee for Enron from 1997 to present. This Defendant has been served and has appeared herein through counsel. In 2000 and 2001, Jaededicke sold 13,360 shares for $841,438.

2.22    Defendant CHARLES A. LEMAISTRE ("LeMaistre") is an individual residing in San Antonio, Bexar County, Texas who has been served and has appeared herein through counsel. Lemaistre has served as a Director of Enron since 1985, serving in the Executive Committee and the Compensation Committee, including as Chairman. Lemaistre executed the 1997, 1998, 1999 and 2000 financial statements of Enron. During the period 1999 to 2001, LeMaistre sold more than 17,000 shares for in excess of $800,000.

2.23    Defendant JOE H. FOY ("Foy") is an individual residing in Kerrville, Kerr County, Texas who has been served and has appeared herein through counsel. Foy served as a member of the Audit Committee for Enron from 1997-1999. In 1999 and 2000, Foy sold more than 31,000 shares for in excess of $1.6 million.

2.24    Defendant JOSEPH M. HIRKO ("Hirko") was at all relevant times, the Chief Executive Officer of Enron Broadband Services and has been served and has appeared herein through counsel. From 1997 to present, Hirko sold more than 473,837 shares for in excess of $35.1 million.

2.25    Defendant KEN L. HARRISON ("Harrison") is an individual residing in Portland, Oregon and has been served and has appeared herein through counsel. Harrison served as a Director for Enron from 1997-2001. Harrison executed the 1997, 1998, 1999 and 2000 financial statements of Enron. During 1999 and 2000, Harrison sold more than 1 million shares for in excess of $75 million.

2.26    Defendant MARK E KOENIG ("Koenig") was at all relevant times, Executive Vice President, Investor Relations of Enron. This Defendant has been served and has appeared herein through counsel. From 1997 to present, Koenig sold more than 129,153 shares for in excess of $9.1 million.

2.27    Defendant STEVEN J. KEAN ("Kean") is an individual residing in Houston, Harris County, and has been served and has appeared herein through counsel. Kean has been Executive Vice President and Chief of Staff of Enron beginning in 1999. From 1999 to present, Kean sold more than 64,932 shares for in excess of $5.1 million.

2.28    Defendant REBECCA P. MARK-JUSBASCHE ("Mark-Jusbasche") is an individual residing in Houston, Harris County, Texas and has been served and has appeared herein through counsel. Mark-Jusbasche served as a Director of Enron from 1999-2000. Mark-Jusbasche executed the 1999 financial statements of Enron. During the period from 1999-2000, Mark-Jusbasche sold more than 1.4 million shares for nearly $80 million.

2.29    Defendant MICHAEL S. MCCONNELL ("McConnell") is an individual residing in Houston, Harris County, Texas and has been served and has appeared herein through counsel. McConnell served as Enron's Executive Vice President of Technology. From 1997 to present, McConnell served as Enron's Executive Vice President of Technology. From 1997 to present, McConnell sold more than 30,960 shares for in excess of $2.3 million.

2.30    Defendant JEFFREY MCMAHON ("McMahon") is an individual residing in Houston, Harris County, Texas and has been served and has appeared herein through counsel. McMahon was the Executive Vice President, Finance and Treasurer of Enron since July 1999. From 1999 to present, McMahon sold more than 39,630 shares for in excess of $2.7 million.

2.31    Defendant CINDY K. OLSON ("Olson") is an individual residing in Houston, Harris County, Texas and has been served and has appeared herein through counsel. Olson served as the Executive Vice President, Human Resources for Enron. From 1997 to present, Olson sold more than 83,183 shares for in excess of $6.5 million.

2.32    Defendant BRUCE WILLISON ("Willison") is an individual who, upon information and belief, has been served and has appeared herein through counsel. Willison served as a member of the Audit Committee for Enron in 1997.

2.33    Defendant FRANK SAVAGE ("Savage") is an individual who, upon information and belief, has been served and has appeared herein through counsel. Savage has served as a Director of Enron since 1999, serving on the Finance Committee and Compensation Committee.  Savage executed the 1999 and 2000 financial statements of Enron.

2.34    Defendant HERBERT S. WINOKUR, JR ("Winokur") is an individual who has been served and has appeared herein through counsel. Winokur has served as Director of Enron from 1985-2001, serving on the Executive Committee and Finance Committee, including as Chairman. Winokur executed the 1997, 1998, 1999 and 2000 financial statements of Enron.

2.35    Defendant JEROME J. MEYER ("Meyer") is an individual residing in Wilsonville, Oregon, and has been served and has appeared herein through counsel.   Meyer served as a Director of Enron from 1997-2001, serving on the Finance Committee and Nominating Committee.  Meyer executed the 1997, 1998, 1999 and 2000 financial statements of Enron.

2.36    Defendant CHARLES E. WALKER ("Walker") is an individual who has been served and has appeared herein through counsel. Walker served as a Director of Enron from 1985-1998, serving on the Finance Committee and Nominating Committee, including as Chairman.  Walker executed the 1997 and 1998 financial statements of Enron.  During 1998, Walker sold more than 15,000 shares of Enron for in excess of $860,000.

2.37    Defendant PAULO V. FERRAZ PEREIRA ("Pereira") is an individual residing Rio de Janeiro, Brazil and has been served and has appeared herein through counsel.  Pereira has served as a member of the Audit Committee for Enron since 1999.

2.38    Defendant JOHN WAKEMAN ("Wakeman") resides in the United Kingdom and has been served and has appeared therein through counsel. Wakeman has served as a member of the Audit Committee for Enron from 1997 to present.

2.39    Defendant JOSEPH W. SUTTON ("Sutton") is an individual residing in Houston, Harris County, Texas and has been served and has appeared herein through counsel. Sutton served as Enron's Vice Chairman until early 2001. From 1997 to present, Sutton sold over 614,960 million shares of Enron for in excess of $40 million.

2.40    Defendant JP Morgan Chase & Co., (hereinafter "Chase") is a corporation doing business in the state of Texas. This Defendant may be served through counsel its registered agent CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

2.41    Defendant Citigroup is a corporation that does not maintain a regular place of business in Texas, nor is there a designated registered agent on whom service may be made. Plaintiff seeks service through the Long-Arm Jurisdiction of Texas by Substituted Service on the Secretary of State of Texas.

### III.

### JURISDICTION AND VENUE

3.1    The Court has jurisdiction over the parties and subject matter of this cause, and has jurisdiction to grant all the relief requested by Plaintiff.

3.2    The amount in controversy is within the jurisdictional limits of this Court.

3.3    Venue in this action is proper in the Southern District of Texas.

# IV.

## FACTS

### A.    *Plaintiff's Connection With Enron.*

4.1    In 1993, Plaintiff joined Enron as the Director of Corporate Strategy and Planning. Between 1993 and 1996, Plaintiff held several different positions within Enron, including Director of Commercial Development at Enron Emergency Technologies, Senior Vice President and Chief Financial Officer at Amoco/Enron Solar Power Development ("AESPD") and Executive Vice President and Chief Operating Officer at AESPD. At the end of 1996, Plaintiff became the Co-Chairman and Co-Chief Executive Officer of AESPD. At that time, Plaintiff was given a five-year employment contract which replaced his previous five year employment contract executed in 1995.

4.2    During the course of his employment with AESPD, Plaintiff negotiated the acquisition of a wind company. After the acquisition, AESPD formed Enron Renewable Energy Corporation ("EREC") to hold Enron's interest in the wind and solar businesses. Part of Plaintiff's compensation for the acquisition was in EREC stock. After closing the transaction in the beginning of January 1997, Plaintiff became the Vice Chairman of EREC in addition to his other responsibilities with Amoco/Enron Solar. As part of his compensation package, Plaintiff received tandem option grants effective January 2, 1997.

4.3    The tandem option grants were grants of options to purchase shares of stock in EREC and Enron, respectively, but with a provision that any exercise of options in either company would automatically cancel the grant of option in the other.

4.4    In 1998, AESPD was merged with a company named Solarex, another Amoco/Enron Solar entity. After the merger, Plaintiff accepted the position of Chief Financial Officer ("CFO")

with the newly formed company. Because the CFO position was essentially a demotion in breach of his employment contract, Plaintiff negotiated a new employment contract which was made effective March 11, 1998. Under the contract, Plaintiff had the option of leaving the company within one year while having the departure treated as an involuntary termination for purpose of his employment contract and option agreements. Plaintiff eventually exercised his option to leave the company on April 15, 1999. His departure was treated as an involuntary termination for purposes of his employment contract and option agreements.

4.5    At the time Plaintiff left Enron, sixty percent (60%) of his tandem options were vested. Under the terms of the option grants, Plaintiff had three years from his termination date to exercise his vested options – until April 15, 2002.

4.6    In the summer of 1999, Enron was considering selling EREC or buying out the minority shareholders and option holders to own one-hundred percent (100%) of the company. As a result, Enron contacted all of the option holders in EREC seeking their consent to an amendment to the EREC option plan providing that, in the event Enron decided either to sell EREC or obtain one-hundred percent ownership of it, the option holders would agree to either accept cash reflecting the immediate exercise of their EREC options or to immediately affirmatively elect to keep the Enron options and allow Enron to immediately cancel their EREC options. Without the proposed amendment, the EREC options could not be canceled until the tandem Enron options were exercised.

4.7    To compensate the option holders for their agreement to allow Enron to prematurely terminate their EREC option rights, Enron proposed to immediately vest the unvested EREC options in the event of a triggering transaction. Unfortunately, this benefit did not apply to Plaintiff because he already lost his unvested options, forty percent (40%), when he left Enron in April of 1999.

Therefore, the proposed amendment, as written, allowed Enron to prematurely terminate Plaintiff's EREC option rights without any offsetting value or compensation to Plaintiff. This was because Enron took away three years of the remaining life on Plaintiff's EREC options. Eventually, Plaintiff worked out a deal with Enron that satisfactorily compensated him for the lost option rights.

### B.    *Plaintiff's Election of Enron Options in 2000.*

4.8    In March 2000, Plaintiff received letters from Enron informing him that a triggering event had occurred – EREC had been merged with another subsidiary of Enron. The notice letter required Plaintiff to make an election between two options within thirty (30) days from receipt of the notice. The first option (Option 1) was to keep the Enron options and forfeit the EREC options. The second option (Option 2) was to immediately cash out the EREC options based on the sale price of EREC, which would automatically cancel his Enron options. In April, the deadline for the election was extended to May 10, 2000.

4.9    Because the price of Enron stock was crucial to Plaintiff's election of options, Plaintiff waited until 4:45 p.m. on May 10 to make his election between Option 1 and Option 2. Enron's stock price closed at $74.75 on May 10, 2000, therefore, Plaintiff chose Option 1 -- to keep his Enron options and forfeit the cash-out of the EREC options. This was due, in large part, because the value of Option 1 was considerably greater than that of Option 2 based on the Enron stock price at the market close on May 10, 2000.

4.10    Had Enron's stock price been lower than $69.41 on May 10, 2000, the cash value of Option 1 would have been less than the cash value of Option 2. Given this, Plaintiff would not have elected Option 1 and instead would have received cash of $2,931,983 for his EREC options under Option 2. However, due to serious misrepresentations concerning Enron's financial condition and

profitability beginning at least in 1997 by the Enron executives named herein, with the help of its auditor, Arthur Andersen, Enron's stock price was grossly inflated. Without such misrepresentations, it is probable, if not absolutely certain, that Enron's stock price would have been far below $69.41. Now, as a result of the disclosure of the Defendants' misrepresentations to the public concerning Enron's financial condition, Plaintiffs options will expire worthless on April 15, 2002.

### C.    Defendants' Misrepresentations About the Financial Standing of Enron Caused the Stock Price to be Inflated.

4.12    Enron was engaged in the natural gas, electricity and communications business. Although primarily an energy company focused on the natural gas industry, in 1997 Enron began a diversification program that included making acquisitions and entering into new areas. Over this period of transformation Enron stock prices began to rise. Some analysts attributed the price rise in part due to interest and expectations in Enron's Broadband Services Division. However, investors were unaware that the Broadband Services Division was not performing as the Defendants had led the market to believe. For instance, the Broadband Services Division was experiencing declining demand for bandwidth, and the company's efforts to create a trading market for bandwidth were not meeting with much success, as many of the market participants were not creditworthy.

4.13    Compounding the problems with the Broadband Services Division, Enron had also agreed to a series of complicated financial hedge transactions with limited partnerships controlled by Defendant Fastow. These transactions, which were not fully detailed to investors, purportedly involved in hedging transactions in the broadband market and exposed the company to increased risk

and uncertainty given the weakening market for bandwidth. In addition, Enron was not consolidating the results of these partnerships, nor of other subsidiaries, such that Enron's financial statements did not fully disclose its true financial condition.

4.14    Enron's business ventures were extremely capital intensive and necessitated billions of dollars from debt and equity issuances. To mislead the trading public and to falsely bolster Enron's financial picture, Enron issued false financial statements eliminating unprofitable and debt-ridden subsidiaries from its financial statements. That the financial statements were false and misleading is evident from the fact that the company announced on November 8, 2001 that it would restate its results for 1997, 1998, 1999, 2000 and interim 2001 to include losses from partnerships which should have been consolidated into Enron's results from those years pursuant to Generally Accepted Accounting Principles ("GAAP").

4.15    This announcement had followed on the heels of the company's announcement on October 16, 2001 that it was taking non-recurring charges of $1.01 billion, after tax, in the third quarter of 2001, the period ending September 30, 2001. Defendant Lay commented on the substantial charged, stating:

> "After a thorough review of our business, we have decided to take these charges to clear away issues that have clouded our performance and earnings potential of our core energy business. . . ."

The company press release detailed the charge as follows: $287 million related to asset impairments recorded by Azurix Corp.; $180 million associated with the restructuring of the Broadband Services Division; and $533 million related to losses associated with certain investments and early termination during the third quarter of certain structured finance arrangements with a previously undisclosed entity.

4.16　These announcements marked the downfall of Enron, as the stock plummeted to $0.26 per share. Enron ultimately filed for Chapter 11 bankruptcy protection in December, and its executives are currently under investigation by the Securities and Exchange Commission ("SEC") as well as facing inquiries from Congress.

4.17　An article in THE WALL STREET JOURNAL, on October 17, 2001 explained that the structured finance arrangements involved limited partnerships that were managed by Defendant Fastow, Enron's Chief Financial Officer. The article stated in pertinent part as follows:

> Two of the partnerships, LJM Cyman L.P. and the much larger LJM2 Co-Investment L.P., have engaged in billions of dollars of complex hedging transactions with Enron involving company assets and millions of shares of Enron stock. It isn't clear from the Enron filings with the Securities and Exchange Commission what Enron received in return for providing these assets and shares. In a number of transactions, notes receivables were provided by partnership related entities.

4.18　On October 18, 2001, THE WALL STREET JOURNAL further reported that "Enron . . . shrank its shareholder equity by $1.2 billion as the company decided to repurchase 55 million of its shares that it had issued as part of a series of complex transactions with an investment vehicle" connected to Fastow. The article stated:

> According to Rick Causey, Enron's chief accounting officer, these shares were contributed to a 'structured finance vehicle' set up about two years ago in which Enron and LJM2 were the only investors. In exchange for the stock, the entity provided Enron with a note. The aim of the transaction was to provide hedges against fluctuating values in some of Enron's broadband telecommunications and other technology investments.

4.19　Despite the fact that the results of LJM Cayman L.P. and LJM2 Co-Investment L.P. should have been consolidated into Enron's financial statement--as Enron has now admitted and Arthur Andersen has admitted--they were not. The decision by Enron and Arthur Andersen to

conceal the relationship between LJM and LJM2 and to keep separate books created an accounting "loophole" designed to conceal losses of $95,000,000 in 1999 and $8,000,000 in 2000 from Enron's financial statements. The failure to consolidate also allowed Enron to report $222 million in assets in 1999 -- another accounting loophole -- which it was not entitled to report. Enron has now restated its financial records to record the losses and to remove the assets from its balance sheet.

4.20    In addition to LJM Cayman L.P. and LJM2 Co-Investment L.P., Enron also formed two other limited partnerships designed to obscured the true financial picture of the company. Chewco Investments, L.P. ("Chewco") was formed in 1997 with approximately $400 million in financial backing to buy interests in Enron assets and was run by Defendant Kopper, a managing director of Enron's Global Equity Markets Group. Neither this entity, nor its relationship with Enron, was disclosed to Enron's shareholders. Enron then formed another limited partnership, Joint Energy Development Investments Limited Partnership ("JEDI"), in which Chewco was an investor. In order to keep the losses from these entities and the debt attributed to these entities off Enron's financial statements, Defendants again chose not to consolidate these entities into Enron's financial statements.

4.21    As a result, Enron and Arthur Andersen created another accounting loophole that allowed Enron to conceal record losses from Chewco and JEDI and debt attributed to these two entities by $45 million in 1997, $107 million in 1998, $153 million in 1999, and $91 million in 2000. By the same token, Enron had unrecorded debt in the amount of $711 million in 1997, $561 million in 1998, $658 million in 1999, and $628 million in 2000. All told, Enron had losses totaling more than $396 million and debt exceeding $2.558 billion that it was able to keep off its books, with help from Arthur Andersen.

### D.    *Arthur Andersen Played an Important Role in Enron's Lies.*

4.22    The Defendants wholly failed to issue true and complete financial statements regarding the company. Arthur Andersen, Enron's purported "independent" auditor, failed miserably in performing its obligations. Arthur Andersen provided accounting services to Enron for a number of years, and has performed independent audits of Enron's financial statements for at least the period of 1997 through 2000, issuing unqualified reports thereon. In doing so, Arthur Andersen falsely certified that the year-end financial statements contained in those reports fairly presented Enron's financial position, results of operations and changes of financial position in conformity with GAAP and falsely certified that these financial statements had been examined in accordance with Generally Accepted Auditing Standards ("GAAS").

4.23    As a result of the services rendered to Enron, Arthur Andersen's personnel were present an Enron's corporate headquarters, financial offices and other operations throughout the period in question. Arthur Andersen also had continual access to, and knowledge of, Enron's private and confidential corporate financial and business information, including internal monthly financial statements, board minutes and internal memoranda. Further, Arthur Andersen received substantial compensation for these services, in addition, Arthur Andersen related companies received equivalent, if not greater, compensation for related services. Arthur Andersen, thus knew or recklessly disregarded Enron's actual financial condition and business problems, which were concealed from the investing public. Arthur Andersen, however, issued unqualified reports regarding the company's finances for the periods of 1997, 1998, 1999, and 2000.

4.24    In connection with the work it performed for Enron, Arthur Andersen:

(a)    obtained, or recklessly disregarded, certain evidentiary matters which provided it with information revealing adverse facts about Enron's business and finances and improperly failed to require, or to make, disclose of such facts. As a result of its investigations and audit work, Arthur Andersen knew, or recklessly disregarded, that Enron's publicly-disseminated reports and financial statements were materially false and misleading and/or failed to disclose material facts;

(b)    knew or recklessly disregarded facts which indicated that it should have qualified its opinion on Enron's financial statements for Fiscal Years 1997-2000, the failure to make such qualification was a violation of GAAS, including the Fourth Standard of Reporting;

(c)    failed to require Enron to disclose material facts and allowed Enron to make material misrepresentations regarding Enron to Enron's security holders and the investing public generally during the period in question and also took steps in furtherance of the conspiracy which aided and abetted the wrongdoing complained of herein;

(d)    knew or recklessly disregarded that Enron's publicly-reported revenues and earnings throughout the period in question were materially overstated because Enron employed improper asset and loss recognition techniques;

(e)    knew or recklessly disregarded that employees and officers of Enron had interest in and control over Special Purpose Entities ("SPEs") which should have caused such SPEs to be reported in consolidated financial reports of Enron;

(f)    knew or recklessly disregarded that employees and officers of Enron had close ties to the SPEs, which themselves had huge liabilities that Arthur Andersen knew did not show up on consolidated financial reports of Enron; and

(g)    knew or recklessly disregarded that Enron had a note receivable received in exchange for stock issued in 2000.

4.25    Arthur Andersen issue a clear and unqualified report or certification for the fiscal years 1997-2000, while knowingly or recklessly disregarding that the following GAAS, among others, were violated:

(a)    The American Institute of Certified Public Accountants ("AICPA") standard which requires that due professional care is to be exercised in the performance of the examination and in the preparation of the report;

(b)    The AICPA standard which requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations in order to afford a reasonable basis for an opinion regarding the financial statement under examination;

(c)    The AICPA standard which requires that the disclosures contained in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report; and

(d)    The AICPA standard which requires that in all matters relating to the engagement, an independence in mental attitude is to be maintained by the auditor(s).

4.26    In the course of rendering services to Enron, Arthur Andersen either obtained knowledge of, or recklessly disregarded, the true financial picture of the company. Arthur Andersen pursued a conspiracy and common course of conduct with Enron and aided and abetted in making false and misleading statements complained of herein. Arthur Andersen was a direct, necessary and substantial participant in the conspiracy and common course of conduct complained of herein. Arthur Andersen and Enron were the agents of each other and were, at all times relevant herein, acting within the course and scope of said agency. Such a conclusion is a necessary result of the fact that Arthur Andersen has admitted to being both an internal auditor of Enron and its independent auditor and to receiving compensation for non-audit services.

4.27    Arthur Andersen had admitted to Congress that it knew of the course of conduct that

resulted in the inaccurate financial condition of Enron and failed to disclose such conduct to anyone. Arthur Andersen Chief Executive Officer Joe Baradino testified before the United States House of Representatives Committee on Financial Services on December 12, 2001 that with respect to 20% of the under-reported special purpose entity consolidated losses that "our team made an error in judgment." Against this background, Arthur Andersen has recently announced global net revenues of $9.3 billion for fiscal year end for August 31, 2001, $47.5 million of which came from services related to Enron, $3.2 million of which was related to services for review of financial controls. Despite this amount of billings to Enron and an admitted clear 'error in judgment', Arthur Andersen maintains its independence and continues to request the public's confidence.

### E.    Enron's Audit Committee Was a Sham.

4.28    In addition, the Audit and Compliance Committee ("Audit Committee") of the Enron Board of Directors serves to oversee Enron's financial reporting, internal controls and compliance process. Every year during the relevant time period, the Audit Committee met with Arthur Andersen, as well as Enron officers and employees responsible for legal, financial and accounting matters. These Enron officers and employees necessarily included Defendants Lay, Skilling, Fastow, Causey and Buy. In addition to recommending the appointment of independent auditors like Arthur Andersen to the Board of Directors, the Audit Committee reviewed the scope of and fees related to the audit, the accounting policies and reporting practices, contract and internal auditing and internal controls. In relevant years the Audit Committee was comprised of Defendants Jaededicke, Chan, Foy, Wakeman, Gramm, Willison, Mendelsohn, and Pereira. These directors wholly failed in their duties to oversee the auditing process and acted in concert with Arthur Andersen in misrepresenting the true financial picture of the company.

### F.     Chase's Role in Enron's Lies

4.29     The Defendants affirmatively assisted Enron in creating circular deals in attempts to defraud and mislead its stockholders regarding the financial stability of the company.  An elaborate transactional scheme was planned and executed between the two Defendants, in which Chase bought oil from Enron and immediately sold it back to the company to show profit margins which were fraudulent.  An offshore entity, Mahonia, was created to facilitate the fraudulent accounting activity.

4.30     Chase pursued a conspiracy and common course of conducted that resulted in the aiding and abetting of false and misleading information leading to the conduct complained of herein.

4.31     Evidence of Chase's contribution to Enron's defraud of its stockholders was offered in court at testimony by its bank lawyer, Philip Levy.

### G.     Citigroup's Role in Enron's Lies

4.32     The Defendants affirmatively assisted Enron in defrauding its stockholders by utilizing "prepays", where huge loans were disguised as energy trades which allowed Enron to mask the loans as profits and cash flow, which gave the impression of healthy thriving business.

4.33     Citigroup also aided Enron in its schemes to manipulate its financial statements and to deceptively reduce Enron's tax obligations by actively aiding in deceptive transactions, which resulted in Citigroup gaining compensation in "fees" for its role in the duplicity.

### H.     Defendants' Dumped Their Stock Just Before the Boat Sank.

4.32     Enron's stock was publicly offered and sold.  At all relevant times herein, Enron's common stock was listed and traded on the NASDAQ and New York Stock Exchange under the symbol ENE.  The individual Defendants acted with malice in that they knew that the public documents and statements issued and disseminated in the name of Enron were materially false and

misleading.  As a result of Defendants' knowledge concerning transactions and partnerships kept

away from the trading public, Defendants engaged in massive insider trading to protect themselves

from losses and to capitalize on Enron's grossly inflated stock price.  From 1997 to 2001, Defendants

engaged in unlawful insider trading by disposing of millions of dollars of their own Enron shares

while in possession of the material adverse information concerning Enron's financial picture.

**V.**

**CAUSES OF ACTION**

**A.     *Violations Of The Texas Securities Act***

5.1     Plaintiff asserts this cause of action for violations of the Texas Securities Act, TEX.

REV. CIV. STAT. ANN. art. 581-1 et seq., and in particular Article 581-33 of the Texas Securities Act.

5.2     By reason of the foregoing, Defendants have violated, conspired to violate and/or

aided and abetted violations of Article 581-33 by making untrue statements of material facts or

omitting to state material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading.

5.3     The Defendants' public pronouncements and filings materially misrepresented or

failed to disclose numerous material facts.

5.4     By reason of their conduct and omissions, Defendants violated, aided, abetted or

controlled another who violated Article 581-33 of the Texas Securities Act, and the Defendants are

jointly and severally liable to Plaintiff.

5.5     Plaintiff has suffered substantial damages as a result of the conduct described above.

**B.    Statutory Fraud (Fraud in a Stock Transaction)**

5.6    Plaintiff asserts this cause of action for violations of Tex. Bus. & Comm. Code Ann. § 27.01.

5.7    By reason of the foregoing, Defendants have violated, conspired to violated, aided and/or abetted violations of § 27.01 by making false representations of past or existing material facts or omitting to state past or existing material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

5.8    Such false representations were made for the purpose of inducing the general trading public including Plaintiff to enter into contracts for the purchase and sale of the Enron securities in question.  Such false representations were relied upon by Plaintiff in entering into such contract.

5.9    Defendants made such representations knowingly and with actual awareness of the falsity thereof, and/or had actual awareness of the falsity of the representations made by one or more other Defendants, yet failed to disclose the falsity of the representations, and benefitted from the false representations.

5.10    Plaintiff has suffered substantial damages as a result of the conduct described above.

**C.    Common Law Fraud**

5.11    Plaintiff asserts this cause of action for common law fraud (including fraudulent concealment).

5.12    By reason of the foregoing, Defendants have engaged in common law fraud by employing devices, schemes, conspiracies and artifices to defraud, making untrue statements of material facts or omitting to state material facts necessary to make the statements made in light of the circumstances under which they were made, not misleading, and/or engaging in acts, practices

and a course of business which operated as a fraud or deceit upon Plaintiff in connection with his election of option contracts for Enron securities.

5.13    Each of the Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements and omissions would adversely affect the integrity of the market for Enron stock and would artificially inflate or maintain the price of such securities. Had the adverse facts Defendants concealed been disclosed, the sale of and market for Enron's securities would not have been possible.

5.14    As a result of Defendants' fraudulent conduct as described herein, the sale of Enron securities was made possible and the market price of Enron securities was artificially inflated during the period in question.

5.15    In ignorance of the false and misleading nature of the representations described above, Plaintiff relied, to his detriment, on the integrity of the regulatory process and/or the market both as to price and as to whether these securities were marketable and valuable.

5.16    The price of Enron stock declined materially upon the disclosure of the true, material facts which had been previously misrepresented and concealed.

5.17    Plaintiff has suffered substantial damage as a result of the conduct described above.

**D.      *Negligence and Professional Malpractice***

5.18    Plaintiff asserts this cause of action for common law negligence and professional malpractice.

5.19    Arthur Andersen held and continues to hold itself out as a professional accountancy partnership firm qualified to perform certified accounting services for large companies such as Enron, including independent audits. Therefore, Arthur Andersen must be held to the standard of

care required to certified public accountants, as reflected by the General Standards of the American Institute of Certified Public Accountants, GAAS, and GAAP.

5.20    Arthur Andersen's conduct, acts and omissions fell below the required standard of care and was a cause of substantial damage to Plaintiff.

5.21    Moreover, Arthur Andersen exhibited such an entire want of care as to indicate that the acts and omissions in question were the result of conscious indifference to the rights, welfare or safety of the persons affected by them, including Plaintiff, so as to constitute malice as that term is defined in the Texas Civil Practice and Remedies Code.  Plaintiff is, therefore, entitled to an award of exemplary or punitive damages.

## VI.

### DAMAGES

6.1    As a result of the Defendants' wrongful conduct as described above, Plaintiff has suffered substantial actual and special damages, far in excess of the minimum jurisdictional limits of this Court.

6.2    Plaintiff has suffered actual damages and losses as measured by statute, including the amount or consideration paid (forfeiture of cash payment for EREC options) for the Enron option contracts because said contracts are today worthless.

6.3    Moreover, Plaintiff has suffered actual damages and losses in the following respects:

a.      Loss of investment opportunity; and

b.      Loss of earnings (including lawful interest).

6.4     As part of his damages, Plaintiff is entitled to recover reasonable and necessary attorneys' fees, expert witness fees, costs for copies of depositions and court costs pursuant to TEX. BUS. & COMM. CODE ANN. § 27.01 and TEX. REV. CIV. STAT. ANN. art. 581-33.

6.5     In addition, the above described statutes entitle Plaintiff to recover punitive damages. Each of the Defendants' conduct was done fraudulently, knowingly, with actual awareness, malice and intent, and/or with such an entire want to care as to indicate that the acts and omissions in question were the result of conscious indifference to the rights, welfare, or safety of the persons affected by them, including Plaintiff, such that Plaintiff is entitled to recover punitive damages.

6.6     Defendants are jointly and severally liable for the damage sustained by Plaintiff.

6.7     Plaintiff is entitled to pre-judgment interest on his damages as provided by law.

6.8     Nothing Plaintiff did or failed to do caused or contributed to cause the occurrence or damages described herein.

6.9     Plaintiff invokes the doctrines of agency, conspiracy, joint enterprise or venture, partnership, vicarious liability and estoppel, as among each of the Defendants.

6.10    All conditions necessary have occurred.

## VII.

### JURY DEMAND

7.1     Plaintiff demands trial by jury.

## VIII.

### PRAYER

For these reasons, Plaintiff prays that Defendants be cited to appear and answer and that Plaintiff have judgment against Defendants for the following:

a.    All actual, consequential, and special damages;

b.    Disgorgement of Defendants' profits gained from their fraudulent conduct;

c.    Exemplary damages in an amount determined by the sound

discretion of the trier of fact;

d.    Reasonable and necessary attorney's fees;

e.    Costs of suit;

f.    Prejudgment and post-judgment interest as allowed by law; and

g.    All other relief, in law or equity, to which plaintiff may be entitled.

Respectfully submitted,

_Randall O. Sorrels_

RANDALL O. SORRELS
Texas Bar No. 18855350
Federal ID No. 11115
800 Commerce Street
Houston, Texas 77002-1776
(713) 222-7211 (Telephone)
(713) 225-0827 (Facsimile)
LEAD COUNSEL FOR PLAINTIFF

OF COUNSEL:

ABRAHAM, WATKINS, NICHOLS,
SORRELS, MATTHEWS & FRIEND
Sean A. Roberts
Texas Bar No. 00797328
Federal ID No. 28177
800 Commerce Street
Houston, Texas 77002-1776
(713) 222-7211 (Telephone)
(713) 225-0827 (Facsimile)

## <u>CERTIFICATE OF SERVICE</u>

      This will certify that the true and correct copy of the above and foregoing has been furnished to all attorneys of record pursuant to the attached Service List by facsimile and/or certified mail, return receipt requested on the ____ day of _____ 2003.

_____
Sean A. Roberts